## STUART v. PEDERSON.

No. 2255.    Decided May 11, 1912.    Rehearing denied June 21, 1912
(125 Pac. 395).

1. PLEADING—DEMURRER—ADMITTING TRUTH—TRUTH OF FACTS PLEADED. The allegations of a complaint must be taken as true for the purposes of demurrer. (Page 316.)

2. ASSIGNMENTS—RIGHTS ASSIGNABLE—FUTURE PROFITS OR INTEREST. Under a statute providing that all real and personal property of any person dying intestate without issue shall descend to his surviving widow, the surviving widow of a decedent owning a part interest in the proceeds of a patent and in the royalties to be paid thereon had an assignable interest in the decedent's rights at the time of his death. (Page 316.)

3. PATENTS—ASSIGNMENT—CONTRACT—CONSIDERATION. An agreement between defendant and plaintiff's deceased husband that on her assignment to a purchaser of all her rights in a patent owned by decedent defendant would pay her one-fourth of the proceeds of sale and one-fourth the royalties to be received was supported by a good consideration. (Page 316.)

4. STATUTES—EVIDENCE OF FOREIGN STATUTES. Under Comp. Laws 1907, sec. 3379, which provides that statutes or codes purporting

to be published under the authority of another state proved to be commonly admitted in the tribunals of such state are admissible in this state as evidence of such law, proof that Mills' Annotated Code of Colorado, properly identified and in evidence, was used by lawyers in that state and used and cited by the Supreme Court, *held* to show that it was commonly admitted in the courts of Colorado as evidence of the written law of that state.  (Page 317.)

APPEAL from District Court, Second District; *Hon. J. A. Howell,* Judge.

Action by Nellie Bennett Stuart against John Douglas Pederson.

Judgment for plaintiff.  Defendant appeals.

AFFIRMED.

*S. T. Corn* and *Jas. N. Kimball* for appellant.

*Halverson* and *Pratt* for respondent.

### STATEMENT OF FACTS.

In the year 1901 the defendant Pederson, having invented a repeating shotgun containing patentable improvements, and being then engaged in perfecting such improvements and the drawings therefor, entered into an agreement with one A. L. Bennett, who was a gun expert and a traveling salesman of sporting goods.  The agreement was that, in consideration of A. L. Bennett undertaking to pay one-third of the expense of perfecting models, obtaining patents, and disposing of them to some manufacturer of guns, he should have a one-fourth interest in the gun and in the proceeds arising from the sale of the gun or the patents.  It is admitted that Bennett put $257.75 into the enterprise.  It also appears that he wrote to various parties and gun firms who were engaged in the manufacture and sale of firearms with the view of getting some manufacturer of guns to take hold of the invention, manufacture the gun, and place it on the market.

From some of these parties and firms he received favorable replies to his letters, one of which was the Remington Arms Company of New York. On November 2, 1902, Bennett died. His widow, plaintiff herein, thereafter (December 30, 1902) sent defendant, at his request, forty dollars to help defray the expense of obtaining a patent for the gun. Some time prior to August 31, 1903, she again sent defendant sixty dollars. On February 3, 1903, defendant obtained a patent. At that time he had pending in the Patent office an application for another patent. He went to New York and continued the negotiations with the Remington Arms Company that Bennett, during his lifetime, had entered into with that company for the manufacture and sale of the gun. On August 3, 1903, the defendant and the Remington Arms Company entered into an agreement in which the arms company, in consideration of defendant agreeing to assign and transfer to it "any and all improvements which he has theretofore made and which he may thereafter make on the firearms shown and described" in the patent obtained, and in the pending application for patent, agreed to pay defendant $6000 cash and a royalty of thirty-five cents on each gun manufactured and sold. On the same day that this agreement was entered into, defendant assigned all his interest in the invention described in the patent obtained and all his right to the invention described in his application for patent then pending. The Remington Arms Company, knowing of Bennett's interest, insisted, as a condition precedent to the final execution of the contract above mentioned, that a confirmation of the contract be obtained from Bennett's widow, plaintiff herein. Thereupon correspondence immediately ensued between the company, defendant, and Mrs. Bennett regarding the desired confirmation of the contract. After considerable correspondence between the parties, some of which we shall hereafter refer to, a document confirming the contract was obtained from the widow, plaintiff herein, duly signed and acknowledged by her. This document, which was forwarded to the plaintiff by the defendant for her signature,

and which, when signed, was by her returned to defendant, was so far as material here, as follows:

"Whereas A. L. Bennett, deceased, . . . rendered John Douglas Pederson, of Denver, Col., certain financial and other assistances in developing a firearm covered by a certain patent to said Pederson, No. 719,955, and other pending applications, for which assistance said Pederson did agree to convey to said Bennett an undivided fourth part of said patents and profits accruing out of said patents, but which conveyances have never in fact been made and the legal title is in said Pederson, and whereas, said Pederson has conveyed certain interests in said patents to the Remington Arms Company, of Ilion, N. Y., and made a certain contract with the Remington Arms Company . . . which contract is dated August 19th, 1903: . . . Now, in consideration of the premises and of one dollar, to me in hand paid by the Remington Arms Co., and said Pederson, I, Nellie Bennett, widow and sole heir of said A. L. Bennett, deceased, do hereby sanction and approve of all of said transactions and look to said Pederson solely for whatever beneficial interest I may have in the premises. Dated August 31st, 1903. [Signed] Nellie Bennett."

In the course of the correspondence carried on between defendant and plaintiff leading up to the execution by plaintiff of the foregoing assignment, the defendant in a letter bearing date of July 20, 1903, said:

"The Remingtons know nothing about the contract. You see if you do say that no legal written agreement exists you would be perfectly correct and will save much time and trouble; also money. In this case I would be able to wind up the formal part of it at once, receive our money and make a proper division with you. Your saying that no written legal agreement exists does not mean that such an agreement is no longer binding, because it is as binding as ever. But you know that it is not necessary for any contracts between us two. We understood that in case of the sale of the gun you are to receive the whole of Mr. Bennett's share, which was to be one-fourth of the proceeds resulting from the sale

of the gun; also one-fourth of the royalties. Now, you see, if I am left to settle this matter I can do so at once and give you all Mr. Bennett's share and you could divide it with whom you chose or keep it as you see fit. . . . What I would advise and like to have you do is this: Answer all their questions, but tell them that our agreement is merely a verbal one. Also send them a paper duly signed and witnessed, giving me full power to act for your interests in this matter. Sign all papers, receive money for you, etc. You will appreciate the fact that we are partners in this matter . . . and that we must stand together in this deal. . . . The price agreed upon is six thousand dollars down in cash and a royalty of $00.35 (35c) per gun for each gun manufactured under my patents. The cash down isn't very much, but will keep us until the gun is on the market, then we ought to be all right."

The defendant in another letter to plaintiff bearing date of July 24, 1903, said:

"To-day both Remingtons and myself are writing you a third letter to Denver. . . . The only thing to wait for now in the sale of the gun to the Remington Arms Co. is the drawing up of the contract or assignment. I have intimated to them some time ago that there was no legal written agreement between us and that I had verbally full power to act for you in all matters pertaining to the disposal of the gun. . . . If this understanding had not been interrupted the deal would have been finished by the first week in July. . . . You know that between us no legal agreement is necessary, for we understand that in case of a sale you are to receive one-fourth (of the proceeds and royalties). Your saying that no contract exists does not make it invalid, as it would hold between us just the same. But as I said before and I know you will agree, that between us a written contract is entirely unnecessary."

Again, on August 27th, four days prior to the execution of the assignment by plaintiff, the defendant wrote to plaintiff in part as follows:

"Just received yours of August 25, refusing to sign the paper sent you. . . . I'll state the plain facts in a business way. The Remington Arms Co. refused to deposit any money to your or anybody else's order but my own. They say they are buying patents of John Douglas Pederson, the inventor, and are not acting as agents for Mrs. Bennett or anybody else. . . . 'We merely want Mrs. Bennett's acquiescence in this matter as a satisfactory finish to the deal.' . . . Now, when Mr. Bennett became interested in the gun it was with the understanding that whatever I got out of it I was to divide with him. He to get one-fourth of the amount. The patents were taken out and developed by myself alone and I have sole power of assigning them. Thus this is, as the Remington Arms Co. says, a personal matter between Mr. Bennett and myself, with which they have no business. . . . The agreement between Mr. Bennett and myself was, that he was to bear one-third of the total cost of building a model and placing the gun on the market and disposing of it. He was also, as an influential man among shooters and gun firms, to use his influence and aid in the disposal of the gun. . . . Now, this agreement between us was for the sale of the patents which we were applying for at the time. Since then, while I've been here, I invented several improvements on the gun, so it is not now the same gun it was in Mr. Bennett's time. So he would legally have claim on only part of the gun which I am selling to the Remington Arms Co. I believe that you trusted me fully and I had decided to let all these go, and divide as you thought, giving you one-fourth of all money and royalties both on the old gun and on the new improvements. You see if the gun is a success they will be paying royalties on the new improvement patents after the original patents have expired. This was one of the conditions I fought for in the contract. Also in the contract with the Remingtons. As part of the consideration I am to assign them all the improvements I may in the future invent on this gun. So the royalties will last longer than seventeen years if the gun runs that long. . . . You see the royalties are to be paid to me, my heirs (in case

of death) or assigns. So you have a full claim on your share of the royalties, no matter whether I die or not. The Remington Arms Co. do not stop payment of royalties if I should die, do they? And just so long as they are payable you share in them. Now, Nellie, I think you will see that if I wanted to be unfair to you I could have done so long ago and legally I would have been unassailable. But I was priding myself on doing the thing and then settling your share on you when it was done. Though my intentions are the same as formerly, I am very much hurt to think that you have recalled what confidence in me you had and at the last minute want to block the deal."

The Remington Arms Company paid defendant $6000 cash, and on September 4, 1903, defendant wrote to plaintiff inclosing New York draft for $1500, one-fourth of the cash payment. In this letter he said:

"We will now have to wait until the gun is on the market before we get any more. Of course, if it isn't a success, we won't get much more, but if it is we will never need to work any more. . . . But rest assured that you shall receive every dollar due you as the royalties became payable and I shall use all means to make that gun a success."

The gun as first designed and constructed proved to be a commercial failure, and none were sold. What was done in order to make the gun a successful commercial product is detailed by Frank Lawrence, who was, at the time, chief accountant for the Remington Arms Company, in his deposition which was taken on behalf of defendant and by him offered in evidence. In his deposition Lawrence says:

"The Remington Arms Company after that got up another model, and made three guns alike, embodying the same fundamental principles of the other gun. . . . The company made these three models at the same time, three alike. These models were designed by our designers. Mr. Pederson did part of it. There were features embodied in that gun which were undoubtedly not designed by Mr. Pederson, although it was the same old Pederson gun which he brought with him with some alteration, a gun which could be manufactured

on a commercial basis. . . . The expense to the Remington Arms Company for the three guns aforesaid was $9410.21. . . . It included special tools for making models, but not the equipment for making a commercial product. After this, the company went ahead and manufactured the gun and are manufacturing it to-day. . . . Mr. Pederson got his pay for his patent, and drew his royalties as the guns were sold."

The evidence shows that the company began paying defendant royalties July 11, 1908. Defendant failed and refused to pay plaintiff any portion of the royalties received by him from the sales of the gun, hence plaintiff brought this action to compel defendant to account for and pay to her a sum of money equal to one-fourth of all royalties received by him under the contracts mentioned. In her complaint plaintiff sets forth in general terms the substance of the contract, herein referred to, between defendant and A. L. Bennett; that Bennett died on November 4, 1902, in the State of Colorado intestate without issue, leaving surviving him as his only heir at law the plaintiff herein; that at the time of his death Bennett was a citizen and resident of Colorado. After setting forth the contract between defendant and the Remington Arms Company hereinbefore mentioned, plaintiff alleges:

"Thereafter, at the request of the Remington Arms Company, and in order to perfect its rights to manufacture, place upon the market for sale, and to sell the firearms containing such patented improvements, the said John Douglas Pederson procured the plaintiff herein to make, execute, and deliver to the said Remington Arms Company an instrument in writing confirming and approving the aforesaid agreement and assignments; . . . and, in consideration of the execution and delivery of said written confirmation and approval so executed and delivered by the plaintiff, the said defendant then and there undertook, covenanted, and promised that he would pay to said plaintiff one-fourth of the $6000 down payment, . . . that he would render, account, and pay to her one-fourth of all royalties thereafter received by him

from the manufacture and sale of firearms containing any such patented improvements, or any others that he might thereafter apply for, and that might thereafter be used with said patented 'improvements in firearms manufactured and sold by the Remington Arms Company under and by virtue of the aforesaid agreements and assignments."

In the prayer of her complaint plaintiff, among other things, asked for general relief. Defendant demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was overruled, and defendant answered. A trial was had, and the court found on the issues in favor of plaintiff. The defendant was required to account to her for all royalties received by him. The defendant subsequently filed his account, which was settled by the court, and he was required to pay to plaintiff her share of the royalties received by him from the Remington Arms Company under the contracts mentioned.

To reverse the judgment defendant has appealed to this court.

McCARTY, J. (after stating the facts as above).

The first error assigned relates to the order of the court overruling appellant's demurrer. It is contended on behalf of appellant that the action is founded upon the contract entered into between appellant and A. L. Bennett, and that, as the consideration for that contract was certain financial aid and other services rendered appellant by A. L. Bennett in the development and invention of the firearm mentioned, the contract was therefore an asset of Bennett's estate, and can only be enforced by a suit of an administrator of his estate. We do not so construe the complaint. The agreement between appellant and Bennett was pleaded as a matter of inducement only. It tended to explain the circumstances leading up to and surrounding the making of the contract upon which the action is in fact based. This contract is to be found in the correspondence carried on between appellant and respondent, and to which we have referred in the foregoing statement of facts. The consider-

ation for the contract was the assignment by respondent of all her right, title, and interest in the gun mentioned and patented improvements thereon to the Remington Arms Company. This assignment was made by respondent at the special instance and request of appellant and in pursuance of the promises made by him that he would pay her one-fourth of the $6000 down payment to be made on the gun by the Remington Arms Company and one-fourth of all royalties received from sales made by the Remington Arms Company of the gun.

It is alleged in the complaint, and it is admitted, that "A. L. Bennett died in the State of Colorado intestate and without issue, leaving surviving him as his only heir at law the plaintiff, who was and is his widow. It is further alleged that at the time of his death the said A. L. Bennett was a citizen and resident. . . . of Colorado, the laws of which state at the time of his death provided in substance that all property, real and personal, of any person dying intestate, shall, at his death, descend to his surviving widow if he have no issue." Under these allegations of the complaint which, for the purposes of the demurrer, must be taken to be true, the respondent had an assignable interest in the estate of her deceased husband, and this interest included any right, title, or interest that A. L. Bennett may have had in the gun and patents mentioned at the time of his death. (2 A. & E. Ency. L. (2 Ed.) 1029; 4 Cyc. 15; Burrill on Assignments, p. 110.) We are therefore clearly of the opinion that the assignment was a good and sufficient consideration for the contract upon which this action is based, and that the court did not err in overruling the demurrer.

Appellant also assigns as error the admission in evidence of the statute of Colorado in reference to the law of succession, which so far as material here, provides:

"Whenever any person having title to . . . property having the nature or legal character of real estate, or personal estate, undisposed of or not otherwise limited by marriage settlement shall die intestate as to such estate, it shall descend and be distributed . . . in the    **4**

following course and manner namely: . . . if such intestate leave a husband or wife, and no child or descendants of any child, then the whole of the estate of such intestate, real and personal, shall descend to and vest in such surviving husband or wife as his or her absolute estate, subject to the payment of debts," etc. (Mills' Ann. St., sec. 1524.) The statute thus offered and admitted in evidence was in a book purporting to be "Mills' Annotated Code of Colorado." The fourth printed page of that book contains, among other things, the following:

"An act to make 'Mills' Annotated Statutes of the State of Colorado' *prima facie* evidence of the originals in all courts and proceedings in this state. . . .

"Be it enacted by the General Assembly of the state of Colorado:

"Section 1. From and after the passage of this act, the General Statutes of the State of Colorado published in the year A. D. eighteen hundred and ninety-one entitled 'Mills' Annotated Statutes of the State of Colorado,' edited and annotated by J. Warner Mills, Esq., shall be received in all courts and proceedings, and by all officers of this state as *prima facie* evidence of the original."

The book was properly identified, and the evidence showed that was what it purported to be, namely, "Mills' Annotated Statutes of Colorado." The contention made, however, is that the proof was insufficient to show that the book was published by authority of the State of Colorado, and that therefore it was improperly admitted in evidence. Comp. Laws Utah, 1907, sec. 3379, provides:

"Books purporting to be printed or published under the authority of another state or territory, or foreign country, and to contain the statutes, Code or other written law of said state, territory, or country, or *proved to be commonly admitted in the tribunals* of such state, territory, or country as evidence of the written law thereof, are admissible in this state as evidence of such law." (Italics ours.)

Appellant urges that the evidence failed to show that the book was published by authority of the State of

Colorado, and that, therefore, it was improperly admitted in evidence. We think the excerpts taken from the fourth page of the book show that it purported to be published under the authority of the State of Colorado. Independent, however, of what the book itself shows regarding the authority under which it purports to be published, there is evidence in the record which we think fully meets the requirements of section 3379, *supra*. One Volney C. Gunnel, an attorney at law, was called as a witness, and testified that he is, and for twenty-one years has been, practicing law in this state; that prior to coming to Utah he practiced law in the Supreme and other courts of record in the State of Colorado. Replying to the question, "And you have estates pending and in the course of administration in the State of Colorado at this time?" he answered: "Yes, sir; more or less interested all the time." The witness further testified: "I am doing a good deal of business relative to Colorado matters all the time." The following was then propounded: "State what knowledge you have as to whether 'Mills' Annotated Statutes of Colorado' are commonly admitted in the tribunals of that state as evidence of the written law thereof." The witness answered, "The personal knowledge I have I suppose. I notice that the lawyers use the book there. I have not been in court myself and used it, but I know it is in use in the courts there." The witness further testified, "I only know that from the fact that the work is cited by the Supreme Court of that state. . . . It seems to be in general use in the courts of that state, and is recognized by the Supreme Court of that state." We think the only fair inference of which this evidence is susceptible is that "Mills' Annotated Statutes of the State of Colorado" is "commonly admitted in the tribunals" of that state "as evidence of the written law thereof." This assignment of error is therefore overruled.

In his assignments of error appellant assails the decision rendered by the court on the merits on the ground that the decision is not supported by evidence. These assignments are without merit. We therefore deem it unnecessary to review

or discuss them. We remark, however, that a decision contrary to or materially different from the one rendered by the court would not in the face of the undisputed evidence in this case be permissible.

The judgment is affirmed, with costs to respondent.

FRICK, C. J., and STRAUP, J., concur.